**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| United States of America, *ex rel.* [FILED UNDER SEAL], | ) ) ) | Civ. A. No. _____ |
| Plaintiff-Relator, | ) ) | COMPLAINT (Jury Trial Demanded) |
| v. | ) ) | |
| [FILED UNDER SEAL], | ) ) | (Anti-Kickback, 42 U.S.C. §§ 1320a-7b(b)) (False Claims Act, 31 U.S.C. §§ 3729-3733) |
| Defendant. | ) ) ) | **DO NOT PLACE IN PRESS BOX** **DO NOT ENTER ON PACER** |

**FILED *IN CAMERA* AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

This *qui tam* action is brought by [FILED UNDER SEAL], an individual, on behalf of the United States of America ("United States" or "Government"), against [FILED UNDER SEAL] for treble damages and civil penalties arising from [FILED UNDER SEAL] unlawful scheme to defraud the United States' Medicare, Medicaid, and TRICARE programs ("Payors") by knowingly causing the submission of false or fraudulent claims for reimbursement in violation of the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and by entering into an unlawful referral and kickback scheme in violation of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b) (the "AKS").

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| United States of America *ex rel.* Jake Fox, | ) ) ) | Civ. A. No. _____ |
| Plaintiff-Relator, | ) ) | COMPLAINT (Jury Trial Demanded) |
| v. | ) ) | |
| On-Belay Medical, LLC, World Water Project, Inc. d/b/a TivaWater, Knoxville Christian Community Foundation, Inc. d/b/a National Christian Foundation East Tennessee, National Christian Foundation, Inc., David Stridde, Mark Slaughter, and David Ragland, | ) ) ) ) ) ) ) ) | (Anti-Kickback, 42 U.S.C. §§ 1320a-7b(b)) (False Claims Act, 31 U.S.C. §§ 3729-3733)  **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| Defendants. | ) ) ) | |

**FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

This *qui tam* action is brought by Plaintiff-Relator Jake Fox ("Fox" or "Relator"), an individual, on behalf of the United States of America ("United States" or "Government"), against Defendants On-Belay Medical, LLC ("OBM"), World Water Project, Inc. d/b/a TivaWater ("TivaWater"), Knoxville Christian Community Foundation, Inc. d/b/a National Christian Foundation East Tennessee ("NCFET"), National Christian Foundation, Inc. ("NCF"), David Stridde, Mark Slaughter, and David Ragland (collectively "Defendants"), for treble damages and civil penalties arising from OBM's unlawful scheme to defraud the United States' Medicare, Medicaid, and TRICARE programs ("Payors") by knowingly causing the submission of false or fraudulent claims for reimbursement in violation of the False Claims Act, as amended, 31 U.S.C.

2

§§ 3729 *et seq.* (the "FCA"), and by entering into an unlawful referral and kickback scheme in violation of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b) (the "AKS").

## JURISDICTION AND VENUE

1.     This action arises under the laws of the United States of America to redress violations of the AKS and FCA.  The Court has subject-matter jurisdiction over this *qui tam* action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730(b).  Fox is not aware of any other complaints filed against Defendants that make the same or similar allegations, or of any public disclosure of the allegations and information contained in this Complaint. Therefore, he is an original source as defined by the FCA and as described more fully herein.

2.     This Court has personal jurisdiction over Defendants because Defendants do business in the United States, including in South Carolina. Specifically, personal jurisdiction is proper because (1) nationwide service of process is authorized by 31 U.S.C. § 3732(a); and (2) Defendants have sufficient minimum contacts with the United States as a whole, and South Carolina in particular, including that Defendants can be found in this State, transact or have transacted business in this State, contracted to supply services or things in this State, and enter into contracts to be performed in this State.

3.     This Court is a proper venue for this *qui tam* action under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), because a substantial part of the events or omissions giving rise to these claims occurred here and because OBM regularly transacts business in the District of South Carolina.

4.     As required by the FCA, Fox will provide the Attorney General of the United States and the United States Attorney for the District of South Carolina with a statement of all

material evidence and information related to this Complaint. This disclosure statement is supported by material evidence known to Fox at the time of the filing of this Complaint that establishes that Defendants deliberately submitted false claims to the Government, caused the deliberate submission of false claims to the United States Government, and entered into an illegal referral arrangement in violation of the AKS.

## *IN CAMERA* REVIEW

5. Pursuant to 31 U.S.C. § 3730(b)(2), this Complaint is to be filed *in camera* and is to remain under seal and shall not be served on Defendants until this Court so orders.

## THE PARTIES

*Plaintiff-Relator Jake Fox*

6. Plaintiff-Relator Jake Fox is a citizen of the United States of America and the State of North Carolina. Fox is suing Defendants, in the name of, and on behalf of, the United States of America. Fox brings this action based upon his direct, independent, and personal knowledge of the facts alleged herein, and also on his information and belief.

7. In August of 2019, OBM hired Fox as an independent contractor to provide medical distributorship services to OBM affiliated physicians and other physicians that Fox had relationships with. Fox has worked in the medical industry for 6 years and has relationships with various medical providers.

8. OBM hired Fox to convince the physicians that Fox knew to utilize OBM's services. Fox was tasked to sell OBM's medical products to physicians in Western North Carolina. OBM sought out Fox to work for them based upon his significant physician business and his medical connections in Western North Carolina.

4

9. Prior to being hired, Fox had numerous conversations with Slaughter regarding OBM's business model and the charitable contribution scheme utilizing donor advised funds through NCF. Slaughter provided Fox with detailed information regarding how physicians received charitable contributions and how they were based upon the amount of referrals that were provided to OBM by the physicians. Fox received correspondence from OBM and other physicians regarding how the charitable contribution scheme worked and how physicians could benefit from the scheme and how the remuneration could be utilized by the physicians.

*Defendant On-Belay Medical, LLC*

10. OBM is a Tennessee limited liability company that was formed in 2012.

11. OBM is a medical device distributorship. OBM distributes medical devices for manufacturers and suppliers and sells the devices to hospitals and/or physicians. Upon information and belief, OBM has entered into financial arrangements with various hospitals to distribute medical equipment. OBM is compensated by the hospitals and product manufacturers for the equipment that is utilized by the hospitals and physicians. Upon information and belief, OBM does business in South Carolina and sells medical devices to physicians in South Carolina including Dr. Timothy McHenry and Dr. Michael Wattenbarger.

*Defendant World Water Project d/b/a TivaWater*

12. TivaWater is a Tennessee nonprofit corporation that was incorporated in 2009. Per its website, TivaWater funds businesspeople that open locally-owned distribution companies that compete in countries that do not have clean water.

*Defendant National Christian Foundation, Inc.*

13. NCF is a Georgia nonprofit corporation that was incorporated in 2001. NCF manages donor-advised funds and offers grants and donations to charitable organizations.

*Defendant Knoxville Christian Community Foundation, Inc. d/b/a National Christian*

*Foundation East Tennessee*

14. NCFET is a Tennessee nonprofit corporation that was incorporated in 1997.

*Defendants David Stridde, Mark Slaughter, and David Ragland*

15. Defendant David Stridde is OBM's chief operating officer.  Upon information and belief, Stridde is a United States citizen and a resident of Knoxville, Tennessee.

16. Defendant Mark Slaughter is OBM's chief executive officer. Upon information and belief, Slaughter is a United States citizen and a resident of Knoxville, Tennessee.

17. Defendant David Ragland is NCFET's president and TivaWater's managing director. Upon information and belief, Ragland is a United States citizen and resident of Knoxville, Tennessee.

## FACTUAL BACKGROUND

18. This case involves fraud against the Medicare and Medicaid programs through an illegal kickback scheme used to give monetary benefits to physicians in exchange for purchasing medical equipment.  The scheme centers upon the payment of charitable contributions to physicians in order to obtain additional referrals for medical equipment.

19. OBM is a medical device distributor that was founded in 2012. Defendant Mark Slaughter is OBM's chief executive officer, and Defendant David Stridde is OBM's chief operating officer.

20. OBM distributes medical equipment for manufacturers and suppliers to hospitals and/or physicians on behalf of medical device manufacturers or suppliers.  The hospitals have entered into financial arrangements with OBM to provide medical equipment to the hospital and its physicians.  After the equipment is provided to the hospital and physician by OBM, the

6

hospital bills Medicare or Medicaid for the cost of the equipment and OBM is paid for the equipment through funds received from Medicare or Medicaid.

21.  Per OBM's website, in 2014 OBM "donated a significant portion of the business to a large 501(c)(3), the [Defendant] National Christian Foundation."

22. NCF is a nonprofit organization that directs donor-advised funds to charitable organizations.  NCF has a local office in Knoxville, Tennessee, which does business as the National Christian Foundation East Tennessee ("NCFET").  Defendant David Ragland is NCFET's president. Upon information and belief, David Ragland's NCFET salary is approximately $211,401.

23. The crux of the illegal and fraudulent scheme in this matter centers upon charitable contributions made to physicians by OBM and NCF.  OBM markets its medical equipment distribution capabilities to physicians. When a physician purchases equipment from OBM, OBM and NCF create a "donor-advised fund" account set up in the physician's name.  OBM and NCF deposit up to ten (10%) percent of the purchased equipment value into the physician's donor-advised fund. The more equipment the physician purchases from OBM, the greater the amount deposited by OBM and NCF into their donor-advised fund.  The amount deposited by OBM and NCF into the donor advised fund accounts for physicians is directly related to amount of referrals that physicians send to OBM.

24. The donor advised fund accounts created by OBM and NCF can be used for charitable donations by the physicians. The money in the donor-advised fund is donated to charities in the physician's name and the physicians are aware of the donations that are made on their behalf.

25. Upon information and belief, the physician may direct the contributions to the charity

that the physician's donor-advised funds benefit. OBM and NCF provide monthly statements to the physicians so that they are aware of the amount that has been placed in their accounts and they know how the money has been directed.

26. Slaughter has indicated that physicians can receive a tax benefit for the charitable contributions and he has stated that the "tax benefit is theirs on the give."  In one text conversation with Slaughter, he confirmed that other individuals who are taken on trips using donor advised funds of the physicians do not receive tax deductions since the physicians are using their own donor advised funds to pay for the expenses.

27. Physicians have directed donor-advised funds to TivaWater, a Tennessee nonprofit corporation.  Per its website, TivaWater's aim is to "provide the best point-of-use water filter in the world" by "help[ing] fund business people to open locally-owned [water filter] distribution companies that compete in the marketplace."

28.  Physicians in conjunction with OBM, NCF and TivaWater use the donor-advised funds to send OBM/NCF affiliated physicians on trips to Uganda.

29. On these trips, OBM sends physicians that buy equipment from OBM to Uganda. The physicians' donor-advised funds pay for these trips, including airfare, lodging, meals, and other expenses and the physicians receive a direct benefit from compensation that has been provided to the physicians by OBM/NCF.  The trips to Uganda started in 2017, and OBM now operates three trips a year due to the popularity of the program. Email correspondence involving OBM and physicians shows that the physicians have supported the trips financially and have paid for the Uganda trips out of their own donor advised funds.  The use of these donor advised funds show that the physicians are receiving compensation in order to direct their referrals to OBM.

30. Dr. Michael Wattenbarger, a Greenville, South Carolina physician, has utilized

8

equipment that has been purchased from OBM and has attended the Uganda trips. Upon information and belief, other physicians who attended the Uganda trips include: Dr. John Hicks, of Hendersonville, North Carolina; Dr. Matthew Hannibal, of Lenoir, North Carolina; and Dr. Todd Abel, of Knoxville, Tennessee.

31. Upon information and belief, physicians attending the Uganda trips are allowed to bring guests who are not OBM customers or affiliated physicians and to cover their expenses through the doctor's donor advised funds. OBM allows this to happen because it is a means of marketing OBM's medical equipment services and allows it to expand its business to other physicians who are not currently under the OBM umbrella.

32. Upon information and belief, OBM and Slaughter have directed as much as possible to the physician donor advised funds in order to receive additional referrals for medical equipment.

33. At least one physician, John Hicks, has stated that he is using OBM as a distributor because of the charitable contributions that OBM has made on his behalf, even though he can purchase the medical equipment at a lower cost from another distributor.

34. OBM affiliated physicians agreed in July 2019 to donate ten (10%) percent of their monthly donor advised fund disbursements received from OBM/NCF into a OBM Medical Fund which will allow OBM to fund its own mission trips.[1]

### **MEDICARE, MEDICAID, TRICARE, AND EEG/VAEEG**

*The Medicare Program*

35. The Health Insurance for the Aged and Disabled Act (Title XVIII of the Social

---

[1] A hypothetical helps us understand how the distributions work. A physician purchases $1,000 of equipment from OBM. OBM Deposits up to 10% ($100) into the physician's donor-advised fund. Per OBM's arrangement, 10% ($10) goes back to OBM's donor-advised fund to pay for future Uganda trips.

Security Act), 42 U.S.C. §§ 1395 *et seq.*, commonly known as Medicare, is a health insurance program designed to assist the nation's elderly meet their healthcare costs. Medicare also provides coverage for younger individuals who are permanently disabled.

36. Among other benefits, Medicare includes hospital insurance under Part A and supplemental medical insurance ("SMI") under Part B. Medicare Part B, 42 U.S.C. §§ 1395c-1395w-6, is a voluntary medical insurance plan designed to supplement hospital insurance coverage. Part B is financed by premiums paid monthly by enrollees which are subsidized by the Government.

37. Generally, Medicare Part B provides coverage for items or services that: (1) fall within a defined Medicare benefit category; (2) are not excluded from coverage by statute, regulation, National Coverage Determination ("NCD"), or Local Coverage Determination ("LCD"); and (3) are determined to be reasonable and necessary for the treatment of an illness or injury.

38. The service provider (*e.g.*, a treating physician or the hospital she is affiliated with) submits claims for payment to the Medicare program.

*The Medicaid Program*

39. Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily the poor and disabled. Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided and under what conditions. The Centers for Medicare and Medicaid Services monitor the state-run programs and establish requirements for service delivery, quality, funding, and eligibility standards.

40.     The Government provides a portion of each state's Medicaid funding. The portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

*The TRICARE Program*

41.     In 1967, the Department of Defense created the Civilian Healthcare and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program created by Congress. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id*.

42.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector healthcare providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

43.     The TRICARE managed healthcare programs are created through contracts with managed care contractors in three geographic regions: North, South, and West. TRICARE healthcare services are provided through both network, and non-network, participating providers. Providers who are Medicare-certified providers are also considered TRICARE-authorized providers. TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

44.     "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's

11

managed care contractor and provide services for an agreed reimbursement rate. 32 C.F.R. §

199.14(a). "Non-Network Participating Providers" include hospitals, other authorized medical

facilities, doctors and healthcare professionals who do not enter an agreement with the region's

managed care provider and are reimbursed at rates established by TRICARE regulations. *Id*.

## THE ANTI-KICKBACK STATUTE
## AND FALSE CLAIMS ACT

45. The False Claims Act, in relevant part, provides that:

> any person who (A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes
> to be made or used, a false record or statement material to a false or fraudulent
> claim; (C) conspires to commit a violation of subparagraph (A), (B), (C) . . . or
> (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit money or property
> to the Government, or knowingly conceals or knowingly and improperly avoids or
> decreases an obligation to pay or transmit money or property to the Government,
> is liable to the United States Government for a civil penalty of not less than
> $5,000 and not more than $10,000 . . . plus three times the amount of damages
> which the Government sustains because of the act of that person.

* * *

> (b) For purposes of this section, the terms the terms "knowing" and "knowingly"
> (A) mean that a person, with respect to information (i) has actual knowledge of
> the information; (ii) acts in deliberate ignorance of the truth or falsity of the
> information; or (iii) acts in reckless disregard of the truth or falsity of the
> information; and (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(a)-(b)

46. The United States Department of Justice adjusted the statutory penalties for violations

of the False Claims Act that occurred after November 2, 2015 and are assessed after January 29,

2018, and made the new penalty per violation a minimum of $11,181 and a maximum of

$22,363. Federal Civil Penalties Inflation Adjustment Act of 1990, 28 C.F.R. § 85.5 & n.3

(2019).

47. Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly

known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

48. The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

49. Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

50. In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

51. The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6).

13

52. In pertinent part, the Stark Statute provides:

    (a)    Prohibition of certain referrals

    (1)    In general

> Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –

    (A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

    (B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(l).

53. Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). 42 U.S.C. § 1395nn(g)(l).

54. "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. 42 U.S.C. §§ 1395nn(h)(l)(A) & (h)(l)(B).

55. The Stark Statute and regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, "bona fide employment relationships" and "personal services arrangements."

56. In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, *inter alia*, the following statutory requirements: (A) the amount of the remuneration is fair market value and not based on the value

14

or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. 42 U.S.C. §§ 1395nn(e)(2)(B) & (e)(2)(C).

57. In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, *inter alia*, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). 42 U.S.C. § 1395nn(e)(3)(A)(v).

58. A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

59. The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. 42 U.S.C. § 1396b(s).

60. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), makes it a criminal and civil offense to knowingly and willfully offer, solicit, pay, or receive any remuneration to induce or reward referrals or items or services reimbursable by a Federal health care program.

61.     The Anti-Kickback Statute prohibits parties from *soliciting and receiving* kickbacks:

> (1) Whoever knowingly and willfully *solicits or receives any remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

\* \* \*

> (B) *in return for purchasing*, leasing, *ordering*, or arranging for or recommending purchasing, leasing, or ordering *any good*, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)(B) (2019) (emphasis added).

62. Furthermore, the Anti-Kickback Statute also prohibits parties from *offering or paying* kickbacks:

> (2) Whoever knowingly and willfully *offers or pays any remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

\* \* \*

> (B) to *purchase,* lease, *order,* or arrange for or recommend purchasing, leasing, or ordering *any good*, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(2)(B) (2019) (emphasis added).

**COUNT I**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Presenting False Claims to Medicare, Medicaid and TRICARE For Designated Health Services Rendered as a Result of Violations of the Stark Statute**

63.     Relator incorporates by reference all paragraphs of this Complaint as set out above.

64.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for reimbursement identified in this Complaint for medical equipment and other designated health services purchased by hospitals with whom Defendants had entered into prohibited financial relationships in violation of the Stark Statute.

16

65.     Defendants presented these claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

66.     In particular, Defendants knowingly presented or caused to be presented, and upon information and belief, are continuing to present or causing to be presented, to the United States of America false or fraudulent claims for payment or approval based on conduct in violation of the Anti-kickback Statute and/or Stark Law. Defendants caused, and are continuing to cause, physicians to purchase medical equipment in exchange for kickbacks and illegal inducements in the form of charitable contributions and travel expenses, including airfares, expenses, lodging, meals, and other costs, in violation of 31 U.S.C. § 3729 (a)(1)(A).

67.     By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $11,181 to $22,363 for each violation. *See* 28 U.S.C. § 3729(a) (2019); 28 C.F.R. § 85.3(a)(9) (2019).

### COUNT II
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Use of False Statements

68.     Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

69.     Defendants made, used, and caused to be made or used, false records or statements, specifically the false certifications and representations made by hospitals and physicians when they submit the false claims paid and approved by the United States.

70.     The false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

71.     By virtue of the false or fraudulent claims made or cause to be made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False

Claims Act in an amount to be determined at trial, plus a civil penalty of $11,181 to $22,363 for each violation. *See* 28 U.S.C. § 3729(a) (2019); 28 C.F.R. § 85.3(a)(9) (2019).

## COUNT III
### False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### False Record to Avoid an Obligation to Refund

72.     Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

73.     Defendants caused to be made or used false records or false statements by treating physicians and hospitals in submitting the cost reports to the United States Government to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

74.     Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

75.     By virtue of the false records or false statements made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $11,181 to $22,363 for each violation. *See* 28 U.S.C. § 3729(a) (2019); 28 C.F.R. § 85.3(a)(9) (2019).

## COUNT IV
### False Claims Act, 31 U.S.C. § 3729
### Liability for Violation of Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)

76.     Relator incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

77.     OBM entered into an arrangement with physicians where OBM gave the physicians financial remuneration in exchange for purchasing medical equipment from OBM. OBM deposited a percentage of the purchased equipment money into a donor-advised fund in the

18

physicians' names, and the physicians were allowed to utilize this remuneration in the donor-advised funds as a direct benefit to themselves and others.

78.     OBM knowingly and willfully violated the provisions of 42 U.S.C. § 1320a-7b(b)(2) ("Anti-Kickback Statute") by paying remuneration to induce increased purchases of its medical equipment.

79.     By virtue of the false records or false statements made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of up to $22,363 for each violation.  *See* 28 U.S.C. § 3729(a) (2019); 28 C.F.R. § 85.3(a)(9) (2019).

## COUNT V
### False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy to Commit a Violation of the False Claims Act

80.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

81.     As detailed above, Defendants knowingly conspired, and upon information and belief, continue to conspire with each other and with healthcare professionals and medical assistants and other intermediaries, to commit acts in violation of 31 U.S.C. § 3729 (a)(1)(A) and (B). Defendants and these healthcare professionals committed overt acts in furtherance of the conspiracy as described above.

82.     As a result of the conduct set forth in this cause of action, the Government suffers and continues to suffer harm as a result of paying or reimbursing for tests which, had the government known such tests were being ordered as a result of the conduct, the Government would not otherwise have paid for/or reimbursed.

83.     By reason of the Defendants' acts in violation of the False Claim Act, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### PRAYER FOR RELIEF

Wherefore, Relator respectfully requests this Court to enter judgment against Defendants as follows:

a.  That the Defendants be ordered to cease and desist from submitting or causing to be submitted any more false or fraudulent claims, or making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim or further violating 31 U.S.C. § 3729 *et seq.,* the Anti-Kickback Statute and/or the Stark Law;

b.  That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, plus three times the amount of damages as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand one hundred eighty-one dollars ($11,181) or more than twenty two thousand three hundred sixty-three dollars ($22,363) per claim as provided by U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemed undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

c.  That Relators be awarded the maximum amount allowed pursuant to U.S.C. § 3730(d), including reasonable attorneys' fees and litigation costs;

d.  That judgment be entered for Relator and against Defendants for all costs, including but not limited to court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

20

e.  That this Court order such other and further relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Relator, on behalf of himself and the United States, demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated: September 17, 2019

/s/ R. Mills Ariail, Jr.
R. Mills Ariail, Jr., Fed. ID No. #7925
mills@rmalawoffice.com
Law Office of R. Mills Ariail, Jr.
11 North Irvine Street, Suite 11
Greenville, SC 29601
Tel: 864.232.9390
Fax: 864.232.9392

ATTORNEY FOR RELATOR